## Fidelity & Casualty Company of New York, et al. v. White.

(Decided June 5, 1925.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

Municipal Corporations—Sureties on Police Officers' Bonds Held Not Liable for Arrest.—Where police officers arrested plaintiff without a warrant and without a public offense having been committed in their presence by plaintiff, and, though acting in good faith, facts which they should have known and discovered showed that no arrest was justified, held that the sureties on their official bonds are not liable.

FRED FORCHT and R. P. DIETZMAN for appellants.

BLAKEY, DAVIS & LEWIS for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

This is an appeal from a judgment rendered on the verdict of a jury under peremptory instructions of the court, awarding appellee damages of $1,200.00 against E. W. Sweeney, $1,000.00 against the Fidelity & Casualty Company of New York, surety on the bond of Sweeney, $650.00 against A. W. Barmore and the Fidelity & Casualty Company of New York, as surety on the bond of said Barmore, and $650.00 against John Bourke, Jr., and

the Fidelity & Casualty Company of New York, as surety on the bond of said Bourke.

E. W. Sweeney was a captain of police on the force of the Louisville police department; A. W. Barmore and John Bourke, Jr., were patrolmen on the police force of the city of Louisville, but were on duty in citizen's clothes at the time of the occurrences hereinafter set forth, and were stationed in the district of which Sweeney was in charge as captain, and were under Sweeney's orders, he being their superior officer.

This is an action for false arrest brought by W. P. White against E. W. Sweeney, A. W. Barmore and John Bourke, Jr., members of the Louisville police department, and the Fidelity & Casualty Company of New York, which company was the surety on all of the bonds of said police officers, arising out of an arrest made in Louisville on or about March 23, 1922. Appellee, W. P. White, was a student at the University of Kentucky and had found it necessary to earn money to complete his interrupted college work. During the winter of 1921 appellee had been working in Texas, and while there learned of a so-called glare shield which was attached to the windshield of an automobile to save the driver from the effect of bright lights from other cars. Together with Mr. K. Ware, who subsequently became his partner in the Kentucky venture, appellee undertook to sell these devices in Corsicana, Texas, and after a successful experience there which demonstrated to him both the usefulness and the salability of the article, the two men bought the Kentucky rights for it, paying $250.00 therefor. The written contract which was introduced at the trial evidenced this agreement. The men immediately came to Kentucky and inserted in the Louisville Times the following advertisement:

> "We are placing men in position to make $300.00 and up per month. Exclusive distributors for an article universally endorsed and without competition. Sales experience unnecessary. See it and be convinced. Small deposit required. Mr. Ware or Mr. White, room 408 Seelbach Hotel."

This advertisement was a copy of one which had been used by the parent concern in Texas, and to appellee seemed both truthful and harmless. It was noticed by one W. P. Lee, a police reporter for the Louisville Times,

who, actuated as he admits chiefly by the desire to get a story, answered the advertisement representing himself to be a man from Lebanon, Kentucky, who had recently sold out his automobile garage and had some money to invest. Appellee and Ware believed Lee, who introduced himself as Joseph M. Thompson, to be a genuine prospect, and proceeded to negotiate a contract with Lee by which the latter was to pay $600.00 for the rights in Jefferson county, this amount to represent an advance payment of fifty cents each on 1,200 of the shields. Lee had sent a wire to the Universal Glare Glass Company asking about appellee and Ware. The telegraph company was unable to find such a concern and so reported to Lee. In the meantime he had advised the city police department that he thought these men were engaged in a "get rich quick" scheme. The name of the company was the Universal Glare Shield Company, not the Universal Glare Glass Company, and the documentary evidence in the case certainly indicates that appellee gave the correct name for the concern. Lee was careless and utterly callous in his attitude toward the men after he had procured their arrest and had secured a double column head for the story which he wrote on the subject. As he testified with cynical candor, once the men were headed for the jail, he paid no further attention to them.

The first interview between Lee and appellee appears to have been on March 22, 1922. On that evening Lee sent his telegram. When he received word that the Universal Glare Glass Company could not be located he concluded that he had a good story, and proceeded to set the trap with the assistance of the police department. Appellant Sweeney telegraphed to the chief of police of Dallas, asking about the Universal Glare Glass Company. He received a reply that this company was not listed in any directories in the city. On the afternoon of March 23, Lee returned to the hotel, completed the negotiations for the trade, let White write up the contract, and was in the act of passing his fictitious checks in payment therefor when the three appellants, headed by captain Sweeney, entered the room and demanded that Ware and White come to the police station with them. There is a sharp variance in the testimony between the two sides as to what took place in the room. Appellee stated that he offered to show the police all of his papers, and this is corroborated by Ware. Appellant Sweeney claimed that

only some typewritten paper was shown him, but he was unable at the trial to tell what was on this paper. Appellant Barmore saw some typewritten paper, but did not even look at it. Appellant Bourke saw some papers lying on the table as they entered, but according to him nobody looked at them. At the trial a printed advertising circular, a printed contract and certain typewritten contracts were exhibited to the jury, which appellee testified were shown, or at least offered to the officers at the time. Naturally, appellee and Ware, who had never been in trouble before, were somewhat excited at the sudden attack upon their business. However, it is hardly believable that these documents, which subsequent events proved authentic, and which obviously were in the room at the time, were not offered to the police. But the police, convinced by Lee and their own telegram that the business was not legitimate, doubtless paid no attention to the evidence offered them. We cite this episode merely as one of the evidences of the carelessness of the police in connection with this arrest. It in no way impugns their good faith. Appellee and Ware went with the officers to the police station, and according to their testimony again attempted to explain their business, but little attention was paid to their explanation. They were then definitely put under arrest charged with vagrancy and setting up and operating a confidence game, but no warrant was sworn out against them. They were photographed, measured, searched and underwent the usual humiliating routine of men charged with crime. Because they were accused of a felony their bond was fixed at $3,000.00, which naturally they were unable to give, and they were therefore confined in jail where they remained until the morning of the trial, which occurred on March 27.

After the arrest, and evidently in the attempt to check further on the prisoners, appellant Sweeney had a wire sent to the Oriental Hotel, asking about W. P. White and K. Ware as recent guests at the hotel. The reply came that they had no record of these men. Although appellant Sweeney testified that this telegram was sent before the arrest, he was forced to admit on cross-examination that the date of the telegram showed conclusively that it was sent after the arrest. Obviously the statement of Ware and White that the proprietors of the Universal Glare Shield Company had occupied rooms at the Oriental Hotel was misunderstood into a

statement that Ware and White had themselves been registered at the hotel.

When the prisoners secured counsel, he had the chief of police wire to the chief of police at Fort Worth, asking as to H. S. Porter, one of the partners in the company and the authority of Ware and White. This telegram sent on March 24, was answered on March 25, with the following wire:

> "Chief of police, Louisville, Ky. We have investigated business of Universal Glare Shield Co., and as far as able to ascertain same is absolutely legitimate. Ware and White are authorized agents for your state. Harry Hamilton, chief of police."

Although Captain Sweeney testified that he kept in touch with the case throughout, he swore that he had never seen this telegram, and knew nothing about it except that a telegram was read to the police judge on the occasion of the trial on the morning of March 27. The carbon of the telegram to the chief of police of Fort Worth seems to have been in the records of the police department from the day it was sent until the day of the trial of the present case, and the reply, after being received in the police department and used by Mr. Odgen in connection with the trial of the case in the police court, was returned to the records in the police department. Both documents remained in these records until counsel for appellee discovered their whereabouts and proved them by Captain Carroll, in charge of the chief's office, who was called to court during the progress of the trial.

On the morning of March 27, two days after the exonerating telegram had been received, appellee and Ware were brought to trial in the police court, the telegram was shown to the police judge, there was no evidence at all introduced against them, and they were dismissed.

A very important point of law is involved in this case as to the liability of a bonding company when an arrest by police officers is made in good faith, although the facts which they should have known or discovered showed that no arrest was justified; in other words, the question is whether there is liability on a bond for the negligent exercise of the arresting power, as distinguished from the malicious abuse of this power. The trial court held that the covenant of the bond covered such an arrest.

Appellee says in his pleading that:

"The defendants, E. W. Sweeney, A. W. Barmore and John Bourke, Jr., and each of them, at the time of the occurrences sued on herein were acting in their official capacity as police officers and each of them thought that this plaintiff had committed a felony, but that said belief which was an honest belief on the part of said officers, and each of them, was induced by a negligent misunderstanding of the facts connected with the business of this plaintiff, and that said defendants and each of them, by the exercise of ordinary care ought to have known that there was no probable cause for believing that plaintiff had committed a felony, but said defendants, and each of them, did all the acts complained of . . . in good faith as such officers and laboring under said erroneous belief that plaintiff had committed a felony."

An official bond, whether it be that of a police officer or of any other person holding a public office, is designed to protect the public against his official misconduct. It is not designed to protect the public against his private misconduct. None of these policemen had a warrant for the arrest of appellee. No public offense had been committed in their presence by appellee, and although these policemen, as alleged in plaintiff's pleadings, in good faith believed the appellee had committed a felony, that belief was the result of a negligent misunderstanding of the facts, and there was in fact no reasonable grounds for their so believing.

"A policeman of the city of Louisville, like any other peace officer, can make an arrest without a warrant only where a public offense is committed in his presence, or he has reasonable grounds for believing that the person arrested has been guilty of a felony." Taylor v. Shields, et al., 183 Ky. 669, 210 S. W. 168; 3 A. L. R. 1619.

In the case, *supra,* this court has said:

"When an officer assumes to act under color of his office, having no writ or process whatsoever, or having process which on its face is utterly void, it seems to be the prevailing doctrine that whatever he may do under such circumstances imposes no liability on his sureties. To constitute color of office

such as will render an officer's sureties liable for his wrongful acts, something else must be shown besides the fact that in doing the act complained of the officer claimed to be acting in an official capacity. If he is armed with no writ, or if the writ under which he acts is utterly void, and if there is at the time no statute which authorizes the act to be done without process, then there is no such color of office as will enable him to impose a liability upon the sureties in his official bond.''

In Jones v. Van Bever, 164 Ky. 80, 174 S. W. 795, L. R. A. 1915E 172, this court said:

"The relation of a surety to and his liability for the acts of his principal, are analogous to the relations of a sheriff to his deputy.''

Further, in Jones v. Van Bever, *supra*, this court said:

"We find the rule to be thoroughly established that, in order to render the sheriff liable for the act of his deputy, the act of the deputy must be done by virtue of his office as deputy; and, in order for the deputy's act to have that character, it must be done in an attempt to serve or execute a writ of process, and as a means to that end, or in acting under a statute giving him the right to arrest without a warrant; otherwise he is acting as an individual. In other words, when a deputy sheriff, although he assumes to act as such, commits a wrong under circumstances where the law does not impose a duty on him to act at all, the wrong is not a violation of any official duty, and is not embraced within the sponsorship of his principal.''

It follows, therefore, that the trial court should have sustained the motion of the Fidelity & Casualty Company of New York, made at the conclusion of all the evidence and should have instructed the jury to find for it.

The judgment is affirmed as to the appellants, Sweeney, Barmore, and Bourke, but reversed as to the Fidelity & Casualty Company.

This case was considered by the whole court, with the exception of Judge Dietzman, who was an attorney in the case and declined to sit.